E-FILED
Thursday, 30 September, 2021  01:35:05 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| GERALD SWAIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:20-cv-04143-SLD-JEH |
| | ) | |
| CHRISTINE E. WORMUTH,[1] | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

Before the Court is Defendant Christine E. Wormuth, Secretary of the Army's Motion

for Summary Judgment, ECF No. 8, and Defendant's Motion for Leave to File Reply to

Plaintiff's Response to United States' Motion for Summary Judgment, ECF No. 11.  For the

following reasons, the Motion for Summary Judgment is GRANTED, and the Motion for

Leave to File Reply is MOOT.

**BACKGROUND[2]**

## I.      Employment History and Work-Related Injuries

Prior to October 2014, Plaintiff Gerald Swain was employed as a wage grade 10

machinist for the Joint Manufacturing Technology Center ("JMTC") at the Rock Island

Arsenal ("RIA").  He experienced a series of work-related injuries while at JMTC, all of

which were accepted for compensation by the Department of Labor, namely: (1) a torn

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Christine E. Wormuth, Secretary of the Army, is substituted for her predecessor.  The Clerk is directed to update the docket accordingly.
[2] At summary judgment, a court must "constru[e] the record in the light most favorable to the nonmovant." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  Unless otherwise noted, the factual background of this case is drawn from Defendant's statement of undisputed material facts, Def.'s Mem. Supp. Mot. Summ. J. 6–18, ECF No. 9; Plaintiff's statement of disputed material facts and additional material facts, Pl.'s Mem. Supp. Resistance Mot. Summ. J. 2–10, ECF No. 10-1 at 1–17; Defendant's reply to Plaintiff's additional material facts, Def.'s Reply 1–15, ECF No. 12; and exhibits to the filings.

rotator cuff on his left shoulder, occurring on October 5, 2012 (this claim was expanded on August 7, 2014 to include a sprain of the rotator cuff on the left arm, partial tear of the left rotator cuff, bicipital tenosynovitis on the left arm, and a rupture of the left biceps tendon); (2) carpal tunnel syndrome on his right hand/arm, beginning October 24, 2013; (3) aggravation of an umbilical hernia, diagnosed January 29, 2015; and (4) further injury of the left rotator cuff in February 2015 when Plaintiff was struck on his left shoulder by an exterior door of his workplace that was caught by the wind.

## II.    Restrictions and Position Change

On January 21, 2013, Plaintiff had surgery to repair his torn rotator cuff.  Prior to this, due to his carpal tunnel, Plaintiff was temporarily restricted from repetitive use of his upper right extremity and from the use of deburring grinder or air tools.  Plaintiff's doctor assigned him permanent restrictions, effective April 15, 2014, due to the complete tear of his left rotator cuff: he was not to push or pull more than two times per hour and had to close and open doors with his right hand only.  Between June and September 2014, Plaintiff was put on a temporary light duty assignment.  His duties were to conduct time observations on direct labor operations, report his findings to the supervisor for corrective action, and conduct inventory counts for the ambulance assembly line.

Plaintiff was offered a permanent light duty assignment as a wage grade 6 tool and parts attendant on September 29, 2014.  He signed the reassignment offer on October 1, 2014.  His change to a lower grade with pay retention became effective October 5, 2014.

On October 3, 2014, Plaintiff had carpal tunnel surgery.  As a result, when he reported to his new permanent position on October 6, 2014, in addition to the permanent restrictions as to his left rotator cuff, he was unable to use his right hand during the post-

2

surgery period.  On October 16, 2014, Plaintiff complained to his new supervisor, Pam Kellums, that the Vidmar tool cabinet drawers in the tool crib were too heavy for him to open.  In response, Kellums directed the drawers to be weighed and every drawer to be marked with its weight; this project was 85 percent complete as of November 14, 2014.  The JMTC Ergonomic Team and RIA Industrial Hygiene supervisor conducted an evaluation of the tool crib, at Kellums's request, on November 12, 2014.

Plaintiff was put on leave from October 22, 2014 until November 23, 2014 by his doctor, who ended up lifting his right arm restrictions on November 14, 2014.  Plaintiff returned to work that same day.  On November 25, 2014, Kellums confirmed with Plaintiff in writing that he would not be asked to open any unmarked drawers in the tool crib.  In December 2014, Rob Strohbehn became Plaintiff's supervisor.

On January 29, 2015 and February 24, 2015, Plaintiff's doctors wrote that he should continue on a ten-pound weight restriction, with no lifting below the waist, due to his hernia diagnosis and that he should also refrain from climbing, working above shoulder height, and operating machinery.  On approximately March 27, 2015, Plaintiff met with Strohbehn, another supervisor, and two union officials, and "[i]t was agreed upon that there was nothing in the Tool Crib that [Plaintiff] could do to stay with in his medical restrictions" and that "[b]oth parties agreed that he could go from cost center to cost center driving an[] electric cart and perform[ing] an inventory check on calibrated measuring equipment," which "would keep [Plaintiff] with in his medical restrictions."  Conger Apr. 13, 2015 Email, Def.'s Mem. Supp. Mot. Summ. J. Ex. 1 at 219, ECF No. 9-3 at 19.

Plaintiff had surgery to correct his hernia in October 2015.  He was released without restrictions related to the hernia on November 23, 2015.  Plaintiff began wearing a brace on

3

his left elbow as needed in 2016.  In March 2017, in response the question as to whether he was "able to perform the essential functions of [his] job without an adjustment," Plaintiff stated that he "c[ould not] do [his] essential functions as they were in September 2016" and that he "need[ed] help in moving things over [his] weight limit of ten pounds from the floor to [his] waist, and then a five pounds limit from [his] waist to above [his] head."  Swain Mar. 15, 2017 Decl. 3, Def.'s Mem. Supp. Mot. Summ. J. Ex. 1 at 463–69, ECF No. 9-4 at 83–89.

### III.    Accommodations

After a workers' compensation examiner conducted a walk-through of the tool crib on November 13, 2014, Plaintiff requested an automatic door opener for the tool setting door and a new scale to help him determine what items fell under his weight limits.  He was on leave between December 29, 2014 and January 6, 2015, and he received the new scale on January 22, 2015.  Plaintiff renewed his request for the automatic door opener on January 29, 2015, via an email sent to Kellums, Strohbehn, and Janine Coupee, Plaintiff's workers' compensation claim representative.  Coupee informed him that he should fill out the official reasonable accommodation paperwork and send it to his supervisor.  On March 19, 2015, Plaintiff emailed Strohbehn an official Request for Accommodation form, which included an additional request for an automatic door opener on the double hallway doors in Building 210 leading to the union office and a restroom.

Swain states that "[o]n or about April 24, 2015, . . . Strohbehn finally got with [him] and [they] evaluated the doors; he said he approved and filled out a form to have the handicap doors installed."  Swain Mar. 15, 2017 Decl. 4.  On July 15, 2015, Strohbehn wrote an email to the Equal Employment Opportunity ("EEO") office stating that while he had approved door openers for the tool setting door and the door to a different men's restroom, he

had not approved door openers for the double hallway doors because "those doors do not weigh enough to fall under his weight restrictions."  Strohbehn July 15, 2015 Email, Def.'s Mem. Supp. Mot. Summ. J. Ex. 1 at 132–33, ECF No. 9-2 at 132–33.  On approximately October 8, 2015, Bradley Niles, Chief of Plant Engineering at JMTC, was informed that door openers had been approved for two doors, and "[f]rom October[]2015 through August[]2016 [his] office focused on completing the approved locations."  Niles Aff. 3, Def.'s Mem. Supp. Mot. Summ. J. Ex. 1 at 483–87, ECF No. 9-4 at 103–07.  On August 22, 2016, Strohbehn informed Plaintiff via email that the double hallway doors had not been approved for door openers.

Plaintiff states that he requested a cart with power steering on April 9, 2015.  Swain Aff. ¶ 7, Pl.'s Mem. Supp. Resistance Mot. Summ. J. Ex. A, ECF No. 10-1 at 18–20.  On May 10, 2016, one of Plaintiff's doctors wrote that "[i]n addition to [his] current work restrictions . . . , he either needs a motorized buggy to carry tools across distance in the workplace, or he needs to rest his shoulder after carrying tools across any distance in the workplace."  Arnold May 10, 2016 Letter, Def.'s Mem. Supp. Mot. Summ. J. Ex. 1 at 310, ECF No. 9-3 at 110.  His doctor made similar statements in letters over the next few weeks.  *See, e.g.*, Arnold May 27, 2016 Letter, Def.'s Mem. Supp. Mot. Summ. J. Ex. 1 at 302, ECF No. 9-3 at 102 (stating that the "[b]uggy must either be power steering or be able to be steered with minimal effort").  By at least July 6, 2016, Plaintiff had a buggy permanently assigned to him.  Prior to that, he had access to buggies, although they were not assigned for his exclusive use.  *See* Swain Feb. 25, 2020 Decl. 14, Def.'s Mem. Supp. Mot. Summ. J. Ex. 2 at 275–92, ECF No. 9-6 at 87–104 (indicating that, as of at least April 27, 2015, Plaintiff had access to and frequently used a buggy to perform his tasks).

5

## IV.    Overtime

The collective bargaining agreement ("CBA") applicable to Plaintiff provides that "[e]mployees on light duty will be considered for overtime . . . to the extent that their restrictions can be accommodated" and that "[i]f the restrictions cannot be accommodated, they will be removed from the overtime list."  CBA art. 9 § 3(e), Def.'s Mem. Supp. Mot. Summ. J. Ex. 4 at 182–186, ECF No. 9-9 at 50–54.  Overtime became available to tool crib employees in January 2017.  Strohbehn did not assign overtime to Plaintiff at that time.  In October 2018, Plaintiff obtained a note from his doctor stating that he was cleared to work overtime.  Strohbehn assigned overtime work to Plaintiff at that time.

## V.    Procedural History

On April 11, 2014, Plaintiff contacted an EEO counselor regarding allegations that his supervisors were discriminating against him on the basis of sex and carpal tunnel and rotator cuff injuries.  He withdrew these claims on February 29, 2016, and in return, Strohbehn provided employer information for Plaintiff's American Health and Life Insurance Company Disability claim form.  On October 25, 2016, Plaintiff filed a formal EEO complaint, which included claims that are part of the current lawsuit, after making initial EEO contract on September 7, 2016.  On February 10, 2017, Plaintiff filed a formal EEO complaint alleging he suffered disability discrimination when another employee raised his voice to Plaintiff and refused to cooperate with him; the complaint was dismissed 13 days later for failure to state a claim.  On March 13, 2018, Plaintiff formally filed an EEO complaint alleging he was discriminated against on the basis of disability when he was denied overtime hours; he had made initial EEO contact on November 21, 2017.  Two other complaints containing similar allegations regarding overtime had been made earlier in 2017.

6

Plaintiff initiated this action on June 24, 2020. Compl., ECF No. 1. He brings claims for failure to accommodate, *id*. at 2–3, disparate treatment, *id*. at 4, and retaliation, *id*. at 4–5. Defendant now seeks summary judgment on all of these claims. Def.'s Mem. Supp. Mot. Summ. J. 5, ECF No. 9. While Plaintiff also brings a hostile work environment claim, Compl. 2–4, he "concede[s] for purposes of summary judgment that the actions of his supervisors and co-workers do not raise to the level of disability harassment" required to establish a hostile work environment claim, Pl.'s Mem. Supp. Resistance Mot. Summ. J. 14, ECF No. 10-1 at 1–17.[3] Defendant has also filed a Motion for Leave to File Reply to Plaintiff's Response to United States' Motion for Summary Judgment, which the Court MOOTS because a summary judgment movant may file a reply without the permission of the Court pursuant to Local Rule 7.1(D)(3).

## DISCUSSION

### I.      Legal Standard

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where one party has properly moved for summary judgment, the nonmoving party must respond "by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252

---

[3] At summary judgment, Plaintiff bears the burden of establishing a genuine dispute of material fact as to the existence of a hostile work environment. *See Ford v. Marion Cnty. Sheriff's Off*., 942 F.3d 839, 856 (7th Cir. 2019).

(1986).  Parties may not merely refer to their own pleadings, *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), but must instead "cit[e] to particular parts of materials in the record, including depositions, documents, [and] . . . affidavits or declarations" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute," Fed R. Civ. P. 56(c)(1).[4]

The court is to "constru[e] the record in the light most favorable to the nonmovant," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003), "resolving all factual disputes and drawing all reasonable inferences in favor of [the nonmovant]," *Grant*, 870 F.3d at 568. However, the nonmovant "is not entitled to the benefit of inferences that are supported by only speculation or conjecture."  *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (quotation marks omitted).

## II.    Analysis

### a.  Failure to Accommodate

In his complaint, Plaintiff alleges that Defendant failed to reasonably accommodate him in that it delayed the installation of door openers on two sets of doors and denied his request for door openers on the double hallway doors in Building 210; it did not provide him the scale he requested until January 22, 2015; and while it granted him permission to drive an electric cart to perform inventory checks, it "fail[ed] to provide him use of a dedicated functional electric cart in order to perform these duties."  Compl. 2–3.

The Rehabilitation Act provides that no "qualified individual with a disability . . . shall, solely by reason of that disability, . . . be subjected to discrimination . . . under any program or activity conducted by an Executive agency." 29 U.S.C. § 794(a); *Garg v. Potter*,

---

[4] "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

521 F.3d 731, 736 (7th Cir. 2008) ("[The] Rehabilitation Act prohibit[s] an employer from discriminating against a qualified individual with a disability because of the disability." (quotation marks omitted)).  "In the employment context, the Rehabilitation Act requires that courts use the standards and provisions relating to employment of the Americans with Disabilities Act[, ("ADA"), 42 U.S.C. §§ 12101–12213] . . . ."  *Novak v. Principi*, 442 F. Supp. 2d 560, 565 (N.D. Ill. 2006) (citing 29 U.S.C. § 794(d)); *Garg*, 521 F.3d at 736 (applying the ADA's definition of disability to a Rehabilitation Act claim).

The ADA defines "discrimination" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee."  42 U.S.C. § 12112(b)(5)(A). "To establish a claim for failure to accommodate, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability."  *E.E.O.C. v. Sears, Roebuck & Co*., 417 F.3d 789, 797 (7th Cir. 2005).  Being a "qualified individual" means that she, "with or without reasonable accommodation, could perform the essential functions of the employment position."  *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001).

To determine a reasonable accommodation, an employer and employee should "engage in an interactive process."  *Sears*, 417 F.3d at 797 (quotation marks omitted).  "If a disabled employee shows that her disability was not reasonably accommodated, the employer will be liable only if it bears responsibility for the breakdown of the interactive process."  *Id*. At summary judgment, it is the burden of the plaintiff to provide evidence that his employer did not reasonably accommodate his disability.  *King v. City of Madison*, 550 F.3d 598, 600 (7th Cir. 2008) ("To survive [the defendant's] motion for summary judgment on her failure-

to-accommodate claim, [the plaintiff] needed to present evidence that, if believed by a trier of fact, would show . . . that [the defendant] failed to reasonably accommodate that disability.").[5]  Reasonable accommodations may include "making existing facilities used by employees readily accessible to and usable by individuals with disabilities" and "job restructuring, part-time or modified work schedules, reassignment to a vacant position, [and] acquisition or modification of equipment or devices."  42 U.S.C. § 12111(9).

While Defendant does not dispute for purposes of this motion that Plaintiff is disabled under the Rehabilitation Act, Def.'s Mem. Supp. Mot. Summ. J. 21, it argues that there is no genuine dispute "that [Plaintiff] was not a qualified individual and that none of the accommodations he identified would have permitted him to perform all the essential functions of his position."  *Id*. at 20.  Plaintiff contends that he is able to perform his job as tool attendant with a few accommodations.  Pl.'s Mem. Supp. Resistance Mot. Summ. J. 11–12.  The first step towards resolving this issue is to identify the essential functions of the tool attendant position at the JMTC.

### i.  Essential Functions

Equal Employment Opportunity Commission ("EEOC") regulations define essential functions as "the fundamental job duties of the employment position the individual with a disability holds or desires."  29 C.F.R. § 1630.2(n)(1).  "The term 'essential functions' does not include the marginal functions of the position."  *Id*.  "The essential-function inquiry is a factual question, not a question of law."  *Brown v. Smith*, 827 F.3d 609, 613 (7th Cir. 2016)

---

[5] The Seventh Circuit "has held that the *McDonnell Douglas* burden-shifting method of proof is unnecessary and inappropriate in a failure-to-accommodate claim"—rather, "if the plaintiff demonstrate[s] that the employer should have reasonably accommodated the plaintiff's disability and did not, the employer has discriminated under the ADA and is liable."  *Mlsna v. Union Pac. R.R. Co*., 975 F.3d 629, 638 (7th Cir. 2020) (quotation marks omitted).  "While evidence of pretext may be relevant in such a case, a pretext analysis need not be part of the reasonable accommodation evaluation."  *Id*.

(emphasis omitted).  EEOC regulations identify various factors that are relevant to determining the essential functions of a position, which include "[t]he employer's judgment as to which functions are essential," "[w]ritten job descriptions prepared before advertising or interviewing applicants for the job," and "[t]he consequences of not requiring the incumbent to perform the function."  29 C.F.R. § 1630.2(n)(3).

The Army Position Description of the job of Tool and Parts Attendant provides that the major duties of the role include "[e]stablish[ing] and maintain[ing] stock levels and commensurate with the needs of the customers"; conducting "[i]nventories by physical count" and "[s]earch[ing] bins for misplaced items"; "[r]elocat[ing] stock"; "[m]ak[ing] preliminary determination and recommendations as to whether damaged tools or parts should be repaired, used as is, or scrapped"; and "[d]etermin[ing] that tools and equipment function properly and that necessary tests, calibrations and repairs are made."  Army Position Description 2–3, Def.'s Mem. Supp. Mot. Summ. J. Ex. 1 at 91–95, ECF No. 9-2 at 91–95. The description indicates that attendants "[p]erform[] work on hard surfaces and in work areas that require standing, stooping, bending, and working in tiring and uncomfortable positions" and "[f]requently lift[] and carr[y] tools, parts, supplies and equipment that weigh up to 10 pounds, and may occasionally handle items that weigh up to 40 pounds," with "[h]andtrucks, dollies, and other workers . . . available for assistance with heavier items."  *Id*.

There does not appear to be any dispute that this description encapsulates the essential functions of the job; indeed, Plaintiff cites to it as evidence of the "essential job duties," Pl.'s Mem. Supp. Resistance Mot. Summ. J. 11.  And while Plaintiff's duties were ultimately reduced to going to shop areas to perform inventories, *see* Swain Mar. 15, 2017 Decl. 3 ("As of April 2015 my duties were changed so that I go into the Shop area and do

inventory checks to verify the employees have the accountable items that were checked out fro[m] the Tool Crib."); Conger Apr. 13, 2015 Email ("Both parties agreed that he could go from cost center to cost center driving an[] electric cart and perform an inventory check on calibrated measuring equipment."), the fact that an employer accommodated an employee by reducing many functions of a job does not demonstrate that the reassigned functions were not essential.  *See Winfrey v. City of Chicago*, 259 F.3d 610, 616 (7th Cir. 2001) ("[T]he fact that the City was willing to work with Winfrey will not count as evidence that the position it created is in fact the full ward clerk position."); *Basith*, 241 F.3d at 930 ("[T]he fact that restructuring is feasible, in itself, is not persuasive evidence one way or the other that a function is essential to a job.").

Plaintiff argues that opening the cabinet drawers in the tool crib was not a requirement of the position, Pl.'s Mem. Supp. Resistance Mot. Summ. J. 11, but it is undisputed that tools were stored in the cabinet drawers, Def.'s Mem. Supp. Mot. Summ. J. 8; Pl.'s Mem. Supp. Resistance Mot. Summ. J. 2, and the position description includes relocating tools and searching bins for misplaced items, Army Position Description 2–3; *see also* Kellums Nov. 14, 2014 Email, Def.'s Mem. Supp. Mot. Summ. J. Ex. 2 at 334–35, ECF No. 9-6 at 146–147 (noting that conducting tool inventories involved opening drawers); Swain Mar. 15, 2017 Decl. 2 ("[T]he drawers I *must open* can weigh up to 400 pounds." (emphasis added)).  Based on this evidence, the Court finds that there is no dispute that opening the cabinets in the tool crib was an essential duty of a tool attendant.

### ii.  Reasonable Accommodation

Plaintiff does not argue that he could perform these essential functions without accommodation, so the Court next considers whether there were reasonable accommodations

that would enable Plaintiff to perform the essential functions of his job and whether

Defendant failed to provide such accommodations.  To show that Plaintiff is not a qualified

individual, Defendant argues that the "cabinet drawers were too heavy for him, the need to

repeatedly open and close them violated his permanent work restrictions, and some of the

items he needed to lift and carry were not within his weight restrictions."  Def.'s Mem. Supp.

Mot. Summ. J. 21.  Plaintiff counters that—with accommodations and with the help of other

workers when lifting objects that weighed more than his restrictions allowed—he can

perform his job's essential functions.  Pl.'s Mem. Supp. Mot. Summ. J. 11–12.

There may be a genuine dispute of fact as to whether Plaintiff can perform the

essential functions of the job of tool attendant.  While some evidence suggests that his duties

were reduced to performing inventory on the shop floor because he was unable to perform

other tasks in the tool crib, *see* Conger Apr. 13, 2015 Email (noting that, at a meeting

between Plaintiff, Strohbehn, and other parties, "[i]t was agreed upon that there was nothing

in the Tool Crib that [Plaintiff] could do to stay with in his medical restrictions" and that he

should be tasked with performing inventory checks on the floor instead); Strohbehn Decl.,

Def.'s Mem. Supp. Mot. Summ. J. Ex. 4 at 169–172, ECF No. 9-9 at 37–40 ("[Plaintiff] has

never been asked to . . . perform the regular duties of a Tool and Parts attendant after his

restrictions were put in place."), Defendant does not identify the specific tasks he could not

perform *with* accommodations, which can include the help of other workers when dealing

with especially heavy items.  *See* Army Position Description. And Plaintiff asserts that he

could perform all of these tasks with help.  *See* Swain Aff. ¶ 6.

Regardless, even if Plaintiff were a qualified individual, there is no genuine dispute of

fact that Defendant reasonably accommodated Plaintiff.  Defendant worked with Plaintiff

extensively to find a job that he could perform with his restrictions—first reassigning him to the tool crib as a tool attendant, *see* Light Duty Permanent Assignment 1, Def.'s Mem. Supp. Mot. Summ. J. Ex. 1 at 109–110, ECF No. 9-2 at 109–110, and then limiting his responsibilities to the duty of performing inventory checks on the shop floor, Conger Apr. 13, 2015 Email.  In October of 2014, when Plaintiff complained that certain tool cabinet drawers were too heavy for him to open, Kellums tasked other employees with marking the weight of each drawer in the tool crib, *see* Kellums Nov. 14, 2014 Email, and confirmed that Plaintiff would not be asked to open any unmarked drawers, *see* Kellums Nov. 25, 2014 Email, Def.'s Mem. Supp. Mot. Summ J. Ex. 1 at 151, ECF No. 9-2 at 151.

In November 2014, Plaintiff requested a different scale from the one that he had, which he complains was "heavy, needed to be plugged in in order to generate a measurement and given the nature of the work required [him] to move it around on a cart in order to get to the tools that [he] needed to weigh to determine whether those tools were within [his] weight restriction."  Swain Aff. ¶ 2.  Defendant provided Plaintiff with the requested scale on January 22, 2015.  Discrimination Compl. 12, Def.'s Mem. Supp. Mot. Summ. J. Ex. 1 at 15–35, ECF No. 9-2 at 15–35.  While an unreasonable delay in providing an accommodation can constitute a failure to accommodate in violation of the Rehabilitation Act, "[w]hether a particular delay qualifies as unreasonable necessarily turns on the totality of the circumstances, including, but not limited to, such factors as the employer's good faith in attempting to accommodate the disability, the length of the delay, the reasons for the delay, the nature, complexity, and burden of the accommodation requested, and whether the employer offered alternative accommodations."  *See McCray v. Wilkie*, 966 F.3d 616, 621 (7th Cir. 2020).  The Court does not find that a wait of slightly over two months to receive

the scale he requested—all the while having access to the old, less-desirable scale—was unreasonable.

Plaintiff states he requested a cart with power steering on April 9, 2015.  Swain Aff. ¶ 7.  The evidence indicates that Plaintiff had access to a cart by at least April 27, 2015, although it was not assigned to him exclusively.  Swain Feb. 25, 2020 Decl. 14.  And by July 6, 2020 at the latest, Plaintiff had a buggy permanently assigned to him, Swain Mar. 15, 2017 Decl. 7; *see* Grutzmacher Decl. 2, Ex. 2 at 343–45, ECF No. 9-6 at 155–57 (providing the date)—less than two months after his doctor wrote a letter stating that he "either need[ed] a motorized buggy to carry tools across distance" or a chance "to rest his shoulder after carrying tools across any distance in the workplace," Arnold May 10, 2016 Letter.  While Plaintiff may have preferred an electric buggy assigned for his exclusive use when he first requested one in April 2015, "[r]easonable accommodation does not require an employer to provide literally everything the disabled employee requests," *Schmidt v. Methodist Hosp. of Ind., Inc*., 89 F.3d 342, 344 (7th Cir. 1996), and he still had access to a buggy at least part-time.  Defendant's actions with respect to the buggy were reasonable.

Plaintiff argues that Defendant failed to reasonably accommodate him because of the delay between his request for door openers and their installation on two doors, as well as Defendant's ultimate failure to install door openers on the double hallway doors.  Pl.'s Mem. Supp. Resistance Mot. Summ. J. 13–14.  Plaintiff officially requested door openers in March of 2015.  Swain Mar. 19, 2015 Email, Def.'s Mem. Supp. Mot. Summ. J. Ex. 1 at 119, ECF No. 9-2 at 119.  Strohbehn evaluated the doors in April 2015, Swain Mar. 15, 2017 Decl. 4, and informed the EEO office of his decision in July 2015, Strohbehn July 15, 2015 Email.  JMTC's Plant Engineering Division completed the installation between October 2015 and

August 2016.  Niles Aff. 3. While it did take a little over a year for the door openers to be

installed, Niles testified that "[a] significant amount of time is needed to install the door

openers"—illustrated by the fact that the installation took eleven months—no doubt

complicated by the fact that, as JMTC is a tenant in the building, it needed to get approval to

make any changes to the building's structure.  *Id*. at 3–4.  Plaintiff has not provided the Court

with any evidence suggesting that this lengthy approval and installation process was in bad

faith on Defendant's part.

As for the double hallway doors, Plaintiff's simple assertion that Defendant did not

honor his request to put door openers on these doors, a request he explains only by stating

that "he regularly used" the doors, Pl.'s Mem. Supp. Resistance Mot. Summ. J. 13, does not

establish a failure to accommodate his disability.  While there was a restroom beyond that

door, Defendant put a door opener on a different restroom door, Strohbehn July 15, 2015

Email, providing him with easy access to one restroom, if not the one he preferred.  *See*

*Rehling v. City of Chicago*, 207 F.3d 1009, 1014 (7th Cir. 2000) ("It is well-established that

an employer is obligated to provide a qualified individual with a reasonable accommodation,

not the accommodation he would prefer."); *Vande Zande v. Wis. Dep't of Admin*., 44 F.3d

538, 546 (7th Cir. 1995) ("[A]ccess to a particular sink, when access to an equivalent sink,

conveniently located, is provided, is not a legal duty of an employer.").  Plaintiff has failed to

show why door openers on that particular set of doors were necessary for him to perform his

job or why door openers on the other restroom door were an inadequate substitute.

Because the Court finds that the installation of door openers on that particular set of

doors was not required for Plaintiff to perform his job, any delay in their installation or

notification that they would not be installed is not an accommodation issue.  Perhaps Plaintiff

is arguing that there was a breakdown in the interactive process between Plaintiff and Defendant as to his reasonable accommodations, but the Seventh Circuit has held that breakdowns in the interactive process are only actionable if the end result is that the employer has failed to reasonably accommodate the employee.  *See Rehling*, 207 F.3d at 1015–16 ("Because the interactive process is not an end in itself, it is not sufficient for [an employee] to show that [an employer] failed to engage in an interactive process or that it caused the interactive process to break down.  Rather, [the employee] must show that the result of the inadequate interactive process was the failure of [the employer] to fulfill its role in determining what specific actions must be taken by an employer in order to provide the qualified individual a reasonable accommodation." (quotation marks omitted)).  Here, Plaintiff was provided with a reasonable accommodation; as such, he cannot prevail on this claim solely based on an alleged breakdown of the interactive process.

Because Plaintiff has failed to show the existence of a genuine dispute of material fact as to whether Defendant failed to reasonably accommodate him, the Court grants summary judgment in Defendant's favor on the failure to accommodate claim.

**b.  Disparate Treatment**

Plaintiff also alleges that Defendant discriminated against him on the basis of his disability by "refus[ing] to allow [him] to work overtime until all his physical restrictions have been lifted or removed despite allowing other employees with physical restrictions to work overtime."  Compl. 4.  For a plaintiff to prevail on a claim of employment discrimination brought under the Rehabilitation Act,[6] she must prove that

---

[6] In addition to citing to ADA cases, *see Novak*, 442 F. Supp. 2d at 565, the Court also cites to cases involving other antidiscrimination laws, such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17, because the statutes are similar to the ADA and the Rehabilitation Act.  *See Miranda v. Wis. Power & Light*

(1) she is disabled within the meaning of the statute; (2) that she was otherwise qualified for the job in question; (3) that she was . . . the subject of . . . adverse action solely because of her disability; and (4) the employment program of which her job was a part received federal financial assistance.

*Felix v. Wis. Dep't of Transp.*, 828 F.3d 560, 568 (7th Cir. 2016). When evaluating this issue at the summary judgment stage, a court must determine "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's . . . [disability] caused the . . . adverse employment action." *Ortiz v. Werner Enters., Inc*., 834 F.3d 760, 765 (7th Cir. 2016).

Direct evidence of disability discrimination is rare. *Rowlands v. United Parcel Serv.- Fort Wayne*, 901 F.3d 792, 802 (7th Cir. 2018). Instead, plaintiffs typically demonstrate discrimination with circumstantial evidence.[7] *Id*. This may include "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Monroe v. Ind. Dep't of Transp*., 871 F.3d 495, 504 (7th Cir. 2017) (quotation marks omitted). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself . . . ." *Ortiz*, 834 F.3d at 765. "The ultimate burden of persuading the trier of fact that the

---

*Co.*, 91 F.3d 1011, 1017 (7th Cir. 1996) ("[I]n analyzing claims under the ADA, it is appropriate to borrow from our approach to the respective analog under Title VII.").

[7] Although the Seventh Circuit previously distinguished "direct" from "indirect" evidence, *Andrews v. CBOCS W., Inc*., 743 F.3d 230, 234 (7th Cir. 2014), it has subsequently abandoned this practice, *Ortiz*, 834 F.3d at 763–66. While the evidence in an employment discrimination case is rarely straightforward, the Seventh Circuit has found that attempting to funnel the often factually complex cases into categories has a greater potential for creating confusion rather than simplifying the analysis. *Id*. at 765. This is not to say that courts should completely abandon any acknowledgement of the difference between types of evidence, but they should no longer separate evidence into categories when evaluating it. *See Rowlands*, 901 F.3d at 801–02.

defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).[8]

Defendant argues that Plaintiff cannot show a dispute of material fact as to whether disability discrimination was the reason for the denial of overtime because the evidence shows that Plaintiff "was not eligible to be included on the overtime roster because his lifting restriction could not be accommodated if he worked overtime alone in the tool crib." Def.'s Mem. Supp. Mot. Summ. J. 29–30. Plaintiff disputes this explanation, arguing that prior to January 24, 2017, he and another worker were routinely assigned to work overtime together. Pl.'s Mem. Supp. Resistance Mot. Summ. J. 15.

Under the CBA, "[e]mployees on light duty will be considered for overtime . . . to the extent that their restrictions can be accommodated" and that "[i]f their restrictions cannot be accommodated, they will be removed from the overtime list." CBA art. 9 § 3(e). Plaintiff was assigned to a light duty position. *See* Light Duty Permanent Assignment 1. Strohbehn stated in his declaration that Plaintiff "was not allowed to work overtime because he had a restriction," which meant that he could not "open and close heavy drawers and lift tools which can weigh up to 75 pounds" as required of employees working overtime. Strohbehn Decl. 3. There is no dispute that Plaintiff had restrictions that would have prevented him from opening heavy drawers and lifting tools of up to 75 pounds without the help of another person. *See* D'Angelo Apr. 15, 2015 Letter, Def.'s Mem. Supp. Mot. Summ. J. Ex. 1 at 97, ECF No. 9-2 at 97 (assigning Plaintiff permanent restrictions on his left shoulder); Kellums Nov. 14, 2014 Email (noting that Plaintiff complained about being asked to open drawers in

---

[8] While a plaintiff may use the *McDonnell Douglas* burden-shifting method as a means for "organizing, presenting, and assessing circumstantial evidence" in discrimination cases, *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017), neither Defendant nor Plaintiff attempts to present the disparate treatment case using this method, and the Court will follow their lead.

the tool crib because the task went beyond his restrictions as to weight, pushing, and pulling);
Swain Mar. 15, 2017 Decl. 3 ("I need help in moving things over my weight limit of ten
pounds from the floor to my waist, and then a five pounds limit from my waist to above my
head.").

Strohbehn also affirmed that "the overtime being offered on weekends was setup for
only one employee" and disputed the idea that there had been a past practice of allowing two
employees to work overtime together in case one employee was injured.  Strohbehn Decl. 4.
While Plaintiff asserted in his affidavit "[t]hat prior to . . . January 24, 2017 it was the past
practice in [his] department to allow two workers to work overtime in the tool crib," Swain
Aff. ¶ 12, he stated elsewhere that overtime was not offered until January 2017, Swain Oct.
5, 2018 Decl. 4, Ex. 4 at 163–68, ECF No. 9-9 at 31–36 ("We were not working any
overtime until January 2017 . . . ."), and he has provided no evidence to contradict that after
January 24, 2017, Defendant assigned only one employee to work overtime at a time.  It is
also undisputed that after Plaintiff's doctor provided a note clearing him to work overtime,
Strohbehn assigned Plaintiff overtime work.  *See* Swain Oct. 5, 2018 Decl. 5–6; *see* Def.'s
Reply 20, ECF No. 12 ("Defendant scheduled Plaintiff for overtime after he submitted new
documentation in 2018.").

This does not suggest that Defendant refused to assign overtime to Plaintiff because
he was disabled but, rather, indicates that Defendant determined whether he should be
assigned overtime based on his ability to perform the necessary requirements during the
overtime shift, which does not violate the Rehabilitation Act.  *See Matthews v.*
*Commonwealth Edison Co*., 128 F.3d 1194, 1196 (7th Cir. 1997) ("The employer who fires a
worker because the worker is a diabetic violates the [ADA]; but if he fires him because he is

unable to do his job, there is no violation, even though the diabetes is the cause of the worker's inability to do his job."). Indeed, the fact that Plaintiff was assigned overtime after Strohbehn received a doctor's note stating that he was cleared to work overtime indicates that Plaintiff's inability to perform the necessary tasks was the reason for the initial denial. And Defendant was not required to restructure the overtime shifts by assigning two employees instead of one to ensure that Plaintiff could work overtime prior to his medical clearance. *See Basith*, 241 F.3d at 932 ("Cook County went above and beyond the requirements of the ADA in creating Basith's special assignment. . . . Cook County need not restructure further . . . so that Basith could work an overtime shift." (citation omitted)).

Likewise, the evidence indicates that Defendant's treatment of the other employees referenced by Plaintiff depended on whether it was aware of lifting restrictions that would prevent them from carrying out necessary tasks. While Plaintiff claims that Richard Edwards had a lifting restriction yet was allowed to work overtime, Swain Aff. ¶ 11, Strohbehn declared that he "was not aware of [Edwards] having any weight restriction" and that while Edwards had restrictions, they dealt with his inability to be around a specific type of machinery, not a limit on how much weight he could handle, Strohbehn Decl. 3–4. Plaintiff states that Nick Ziglar was allowed to work overtime while having temporary lifting restrictions after surgery, Swain Aff. ¶ 10, but Strohbehn affirmed that Ziglar "was a contract employee and [Strohbehn] was not aware of any restrictions [Ziglar] may have had," Strohbehn Decl. 3. Plaintiff has produced no evidence suggesting that Strohbehn was aware of any lifting restrictions for either of these employees, while it is clear that Strohbehn was aware of Plaintiff's weight restrictions. Strohbehn also stated that he did not permit Jon Day,

21

another tool attendant with restrictions which would prevent him from performing overtime tasks, to work overtime hours.  Strohbehn Decl. 4.

For these reasons, the Court finds that Plaintiff has failed to show that a reasonable jury could conclude that Defendant discriminated against Plaintiff solely on the basis of his disability by denying him overtime.  *See Ortiz*, 834 F.3d at 765.  Summary judgment is accordingly granted in Defendant's favor on the disparate treatment claim.

### c.  Retaliation

In the retaliation claim, Plaintiff alleges that Defendant retaliated against him for pursuing discrimination claims in April of 2014 by "[r]efus[ing] to allow [him] to work overtime hours available," "[d]elay[ing] the installation of handicapped doors and refus[ing] to install a modified handicapped door in areas of his work space," and "[r]efus[ing] to allow him to file charges of disability discrimination in August 2016."  Compl. 4–5.  Defendant argues that while Plaintiff "assumes that retaliation was the motivation for the[se] actions . . . [,] his conclusions are entirely speculative and unsupported by the evidence of record," and thus he cannot show a genuine dispute of material fact as to whether the but-for cause of any of the alleged retaliatory actions was retaliatory animus.  Def.'s Mem. Supp. Mot. Summ. J. 31.  Plaintiff contends that several issues of material fact remain: he asserts that "the denial of overtime is on the basis of [his] disability and his prior [EEO] filing[s]," as shown by the fact that "two non-protected workers who had lifting restrictions were allowed . . . to work overtime," and, further, that the fifteen-month delay in the installation of the door openers and "the refusal to put a door opener on doors that exceeded [Plaintiff's] weight restriction could be viewed by the trier of fact as grounds for dissuading a reasonable worker from

making or supporting a charge of discrimination." Pl.'s Mem. Supp. Resistance Mot. Summ. J. 16.

42 U.S.C. § 2000e-3(a) provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" related to an unlawful employment practice. To establish retaliation, a "plaintiff must prove that he engaged in protected activity and suffered an adverse employment action, and that there is a causal link between the two." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016).[9] While evidence of suspicious timing can be helpful to a finding of retaliation, the Seventh Circuit has found that "temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter." *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) (quotation marks omitted). At summary judgment, "the plaintiff[] must produce evidence that a retaliatory motive *actually* influenced the decision-maker, not merely that it *could* have." *Brown v. Advoc. S. Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012) (emphasis in original) (affirming a grant of summary judgment in favor of the employer where "the plaintiffs' argument for retaliatory animus relies entirely on speculation").

Plaintiff offers nothing more than speculation that the alleged instances of retaliation were caused by his bringing claims of discrimination. *See* Pl.'s Mem. Supp. Resistance Mot. Summ. J. 16. The Court has already rejected his claim of disparate treatment with regard to overtime, *see supra* Section II(b), and finds now that Plaintiff has provided no evidence

---

[9] While courts previously distinguished direct from indirect evidence of causation when evaluating a claim of retaliation, the Seventh Circuit "recently jettisoned that approach in favor of a more straightforward inquiry: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge?" *Lord*, 839 F.3d at 563.

beyond a time lapse of five months that he was denied overtime because he brought discrimination claims, *see* Pl.'s Mem. Supp. Resistance Mot. Summ. J. 15.  Plaintiff adduces nothing from which the Court could infer that the delay in installing door openers or the refusal to install door openers on the double doors was connected in any way to his discrimination claims.  *See Basith*, 241 F.3d at 933 ("[The employee] makes no attempt to show that [his employer's] employment actions would not have occurred but for his protected expression, and this is fatal to his claim.").  And he cites to no evidence to even suggest that Defendant attempted to interfere with his ability to file disability discrimination charges in August of 2016.  In the complete absence of evidence suggesting a causal link between the protected activity and the alleged retaliatory action, the Court finds that Defendant is entitled to summary judgment on the retaliation claim.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment, ECF No. 8, is GRANTED, and Defendant's Motion for Leave to File Reply to Plaintiff's Response to United States' Motion for Summary Judgment, ECF No. 11, is MOOT.  The Clerk is directed to enter judgment and close the case.

Entered this 30th day of September, 2021.

s/ Sara Darrow
_____
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE